Well, I've been before you many times, but it's been a few months, and I always find myself after those two. The two giants of what we do. Those guys have been around for a while, and I actually used Mr. Wirtz's textbook to teach my students at SIU Law Work. Well, you found the arguments invigorating. I like those arguments. I don't know anything about coal mining, but I am learning more and more each time. Today we have an interesting case in that I usually don't appear before you to try and get you to re-weigh whether or not somebody should be a man as a whole or an outlaw. But that's what I'm going to do today. And there's a traditional part of this argument that we're all familiar with, certainly. It's a battle of the experts from a vocational standpoint. But it's also an important case on this traditional avenue because we need to reinforce the law about how the commission has to take the petitioner as they find them. As they find them to determine outlaw status. The second part of this case is about injurious practice. And it's a very important case in that regard as well. Jamie Hatton, at the time of trial, was a 37-year-old woman who weighed over 300 pounds and had been obese her entire life. She finished parts of the third grade, parts of the fourth grade, and then went to special education classes. She failed to finish high school. She failed to pass the GED. And the vocational testing revealed, based upon an earlier diagnosis of dyslexia, that she could only read and write at a middle school level. Jamie Hatton's past job experience, and we all know the law, to determine the odd lot, we have to look at age, we have to look at work experience, we have to take into account the petitioner's There is nothing in dispute about this accident. There is nothing in dispute about these permanent restrictions. There's no Section 12 exam in the record. Are you, you're not proceeding out of the prong, or are you proceeding out of the prong that your client made a diligent but unsuccessful attempt to find work? I think that's part of it, yes, Justice Hudson. Absolutely. How do you characterize then the claimants, your own vocational expert, Ms. Gonzalez, indicated, seemed to indicate that your claimant's job search was flawed. How do you respond to that? I'll actually speak to that right now. This is a quote from her report. Ms. Hatton Dennis began searching for work in June 2011. Her effort in 2011 was minimal at best. However, her education, lack of direction, and limited job experience must be taken into consideration. In March 2012, a significant job search was She searched for jobs online and made a significant amount of in-person contacts. This is not the job search that you would think that you want to proceed to trial with. It's not, Justice Hudson. But what the law says about proving an odd lot is that you have to take everything about her into consideration when determining whether or not she's an odd lot or a man as a whole. Is there any indication that the commission did not take everything into consideration? The commission's decision, your honor, was based upon the arbitrator's decision, which says the arbitrator found that I did not meet my burden of proof, certainly, on whether or not she was an odd lot. It's an interesting decision because you sort of have to read between the lines of how we got here. The first part of the decision is Petitioner's noncompliance with medical care is, quote, relevant to this determination. Is that the weight loss issue? Correct. And I'll address that as well. The arbitrator notes that the Petitioner's vocational rehabilitation expert, Dolores Gonzalez, did not specifically state that there was no stable labor market for Petitioner. That's the other piece. And what Ms. Gonzalez actually said was, the resistance Ms. Hatton-Dennis faced in the workforce is a direct result of her lack of education, limited work experience, and possibly her appearance as she presents at over 300 pounds. Based on her education and experience, Ms. Hatton-Dennis would be searching for jobs at the unskilled level of work. Employers, even in seeking to fill these unskilled positions, search for the best candidates. Those candidates are educated with a minimum of a GED, which Ms. Hatton does not have, or better, and generally have an overall well-kept appearance. Due to the current state of the economy, the quality of the current candidates vying for the unskilled positions has risen. Ms. Hatton-Dennis is competing for jobs with individuals who are generally more educated, and she does not even possess a GED. This is a significant hindrance in her ability to find work and erodes the occupation. And what do we make of it? As you've candidly acknowledged, it's not the strongest evidence for a diligent but unsuccessful job search, but candidly, if you read the whole thing in context, it's not a terrible report. But then you still have the vocational expert for the employer, Ms. Richter-Hill, saying that it was, you know, not a diligent job search. Thank you. So what do you make of that? As Mr. Wessor said, he's won some cases on manifest, away from the flank. I'll stand over there now and try that as well. The commission is charged with the great responsibility of weighing the evidence, and that's not what this court's tasked to do. But when the evidence is so wrong about, in your question, who the vocational expert is that we should trust, this court has to take a look. Ms. Richter-Hill, if you read her testimony, I'll just say what she said. She testified she was a licensed vocational consultant, which as we all know is a part of the act, a clinical professional counselor and a national board certified clinical hypnotherapist. I didn't get to see Ms. Richter-Hill's CV before, but when she said hypnotherapist, I was interested. Ms. Richter-Hill said that she has barely even worked with injured workers, that her resume was wrong, she admitted to basically lying under oath during the case, and said that one of the tools she would have used... Wait, wait, back up a second. Who admitted to lying under oath in this case? I will read it to you. She testified her current vocational counseling began in September of 2012, but she had been doing, quote, career search and vocational since 1989. She was then handed a copy of her CV. Marked as responding to Exhibit 7, she was directly asked, is this a completely accurate and up-to-date to today's date curriculum vitae, to which she said yes, but later said it was missing employment with SIU at Edwardsville, testifying, I'm sorry, I apologize, I was putting this together in a hurry yesterday. It goes on. She said that she utilized hypnotherapy to find people jobs. You know, sometimes people want to regress, quote, she said. You know, sometimes people have age regression. Sometimes people have something they wanted to do in their childhood, but they put it aside. She was asked on direct examination whether she had been continuously doing vocational counseling since 1989. Here's the answer to your question. She initially responded, oh, I've been off and on. I don't think there's any one time I haven't helped somebody, even if it's a friend, to get a job. She then only later testified that was not true, that she was a part-time vocational counselor on the side. She admitted to be on cross-examination. Her report in this case had an extreme error in it. She went and looked for jobs for my client, and do you know what she told them? She told them my client had run her own business for 20 years. First of all, she would have had to start at 12, Justice Hudson. The business she was referencing was my client's home business, I'll call it, of collecting quarters. Did you try the case before the arbiter? I sure did. So obviously before the arbiter, you, of course, being the experienced jury you are, brought all of these things out, including the credibility flaws of Ms. Richter-Hill. I did. And if you read this opinion, 14 in your record, I'm not sure I'm going to be wrong. I think I lost this case on that issue. I think I lost this case on injurious practice. That's what I think happened. Arbitrator Gallagher makes no mention other than he says what happened. The arbitrator notes the opinion of Respondent Richter-Hill. Listen to what he actually says. That Richter-Hill's testimony was an erroneous assumption, that the petitioner had operated her own business for 27 to 30 years. So he actually sort of agrees with my argument in the decision that's before you today. Well, why don't we just segue into that in your time, because the commission did find that injurious practice. Yeah. Obviously, it's allowed for under the statute, so why were they wrong in finding out, or coming to the conclusion that based upon her failure to comply with the weight loss program, it wasn't injurious practice? Why were they wrong? I was hoping you would be the one to ask that. Why is that? Because you're the answer to that question, Justice Hudson. You wrote an opinion directly on this point. It's the opinion that matters most today to this court. Thank you for refreshing my recollection. Sure. The most recent appellate court case that I can find, Your Honor, is Global Products v. IWCC. That was the first district in 2009. The respondent in that case argued that the petitioner's smoking habit, despite being told to quit by his treating doctors, retarded his recovery post-surgery, thus exposing the respondent to pay for benefits under the Act, just as is the case that I'm asking for today. Now, I have weight loss. I don't have smoking. I have weight loss. The IWCC, the Commission, found no injurious had been committed, and you agreed in writing, Justice Hudson, saying, quote, we see no evidence that the claimant smoked cigarettes for the purpose of retarding his recovery. In this case, it appears the claimant smoked in spite of his potential impact on his recovery, not because of it. Further, the claimant did make an unsuccessful attempt to quit smoking. Nothing indicates that this was not a bona fide attempt, and as the respondent states, it is commonly accepted by the medical community that smoking is an addiction. A reasonable person could certainly conclude the claimant should not be penalized. So how does that control the results here? Because that's exactly what happened here. My client was ordered to go to weight loss by Dr. Gornad, to Dr. Sudo. It's clear in the record that my client did not lose weight by going to Dr. Sudo. But she went to Dr. Sudo. She went to her appointments. There was an issue with her taking Dr. Sudo's advice and utilizing it to lose weight, certainly. But if smoking is not an injurious practice, and this Court has recognized that, then I would say I'm on better footing than that case. Don't get too carried away with that, because as you know, under Section 19D, it does vest the commission with discretion. And we would look at it as an abuse of discretion. So in calling our attention to that case, and we thank you for that, it doesn't stand for the practice that any time somebody denies an improper motive, they automatically win. I understand that. I absolutely agree with that. The totality of the evidence in this record says that my client went to her doctor. She went to Dr. Sudo. The totality of the record, in this case also, there's testimony. There's testimony. She's been heavy her whole life. There's evidence in the record. What was wrong with my client? Let's go back. She had a lumbar back problem that has permanent restrictions. So there's evidence in the record to support Justice Hudson's position that we have to look at this under the abuse of discretion. But if this court says, in my opinion, if this court says that somebody who's habitually overweight, who attends weight loss visits, who doesn't lose weight, and then can't have surgery, if that's an injurious practice, I would say that that is a farce. I don't know that you would find it in and of itself. However, if there's noncompliance, intentional noncompliance with the program, wouldn't that be effective intimacy? I think it would. You shouldn't penalize somebody for their weight. I agree with you. But if somebody isn't complying with the program that's medically necessary as deemed by their doctors, isn't that effective? It is a factor. It is a factor. And that's a tough way. But I'll point you back to the record, Justice Hudson. She went to these appointments. It's sort of like the idea we have out of scaffolding about temporary total disability benefits not being paid if somebody doesn't go and get routine medical care. You can't retard, as you said, you can't retard your own case or your own recovery and not go to the doctor and sit at home and get TTD. But this is a woman who is from special ed classes who's done her best to try and work. Walmart was the best job she ever had. And she got terminated, didn't she? She did, and we tried that case as well. And she'd still be working at Walmart, wouldn't she, if she had not been terminated for other reasons? Justice Moore, thank you for your question. It's a good question. I think that's very speculative on the part of what the record indicates from what the one person from Walmart testified to. The testimony, if you look at it, is that the person from Walmart was the assistant manager. My client was fired. We tried this case to this court on whether or not she needed TTD. We won and went back down. It is almost unbelievable to me to rely on the testimony of the Walmart witness. You know what she said? She said not sometimes, Justice Moore. She said every time. We have a work comp case that somebody has permanent restrictions, we take them back. Not once, not sometimes, not on a case-by-case basis, every time. So what's your theory on why that didn't happen here, real quickly? What's your theory as to why that didn't happen here, then? My client wasn't able to be rehired, Justice Hudson, because she was terminated. Oh, and you said they take them back all the time. So why didn't they take her back? It's a good question. It's a very good question. For another time. Well, you'll have time in reply to enlighten us on that. Thank you. Thank you. Counsel, you may respond. Before I begin, I just want to say I tracked down that case. You did what? Tracked down that issue from yesterday. The record? Yes. Okay. Multiple courts. May it please the Court, my name is Roe. Is your co-counsel going to join you? My co-counsel. No, I meant down there. Oh, yeah, yeah. I would like him. I thought he was my opponent. And, unfortunately, I got Mr. Carraway. Did a good job, but I think part of his argument was flawed. But he's a co-counsel. He's getting ready for his rebuttal. We don't want to interrupt him. I would ask that this Honorable Court find in favor of the Commission's decision in its entirety of holding it that Ms. Hatton Dennis did not meet her burden, showing that she was about permanently totally disabled, and that she was at maximum medical improvement, pursuant to her physician's release on May 9, 2011. So you've got a battle of the vocational experts, both rehab experts. But he raises an intriguing point. Why is this an injurious practice? He seems to be implying, well, if you're sort of punishing somebody for something they can't control, is that fair? No. So that's, you know, there's two aspects to that injurious practice. And I like that or. I don't have the statute on me, and I can pull it out. But it does say, or refuse to submit to medical treatment as reasonable and essential to promote recovery. Well, did she refuse? He's saying that she didn't refuse. She's not compliant. She went to the appointments, but the doctor said, hey, how about some simple walking exercise? How about doing this? No. I want a treadmill. I want surgery. I don't want to do any exercises. That's reasonable, would you think? Simple walking exercises is a reasonable procedure. And I mean, that could be considered bad faith. And like you said, we're weighing, they weighed this evidence. Mr. Carraway was at the trial. I was not at the trial, but he admittedly said that, you know, he put this into evidence. The arbitrator considered it. He considered this evidence in finding that she was noncompliant. And I know we talked about him asking you to re-weigh this evidence, and I understand that's not really the position, unless you find that it's against the manifest weight of the evidence. And for the 19D, the standard abuse of discretion. Very briefly, again, summarize. She went to the program but didn't comply with any of the instructions. Is that the gist of what you're saying? Yes. According to the records, both are physicians. Both are treating physicians. That's why there wasn't an independent medical examiner. It was not needed. Is there evidence in the record, specifically, that in order to undergo surgery she did have to lose a certain amount of weight? Is that your position? Yes. Yes. She did need to lose. Before she could have surgery? Before she could have surgery. Before surgery would have been proposed. I mean, they would have, I think, evaluated her again to make sure that, hey, you know, she might have become asymptomatic. She might have got a lot better at losing the weight. Is there any evidence in the record why she was not allowed to avail herself of other weight loss modality treatments such as gastric bypass? Yes, because they felt that her fact of noncompliance with the simple test that they asked her to comply with, that she would not be a candidate for gastric bypass. And I don't know the protocol to be a gastric bypass patient, but I assume there has to be something that they believe that you are going to do. Besides the surgery. Well, let me finish. Go ahead. Let me finish. That they're going to be compliant in whatever the protocol may be. I mean, certainly you want somebody that you feel is wanting this, and they're going to put forth good effort, at least a reasonable effort, an honest effort. And when she failed to not even do the simplest of tasks that they asked from her, and both doctors saw this. And let's get back. There's an issue here. We talked about this termination, right? We all know why she got terminated. She was working light duty there. She was working at Walmart. And they did testify that she could have continued working. In lightness as to the reason for this termination. Yes, she threatened them with a gun. She said, I'll shoot somebody at work if I go back there. So, therefore, I mean, for public policy's sake, they had to terminate her. I mean, do you want any clerks threatening you guys if they get upset? Absolutely not. And she was in pain, right? That was her excuse. Is that a good excuse? I'm a little bothered by that. Doctors know. Her doctors. Yeah. In a doctor-patient confidential situation, which I know now they're exempted because they can decide that this is, you know, threatening, whatever. Okay. And said the genesis of this is I am in pain, and people are impeding me relief from pain, correct? Are you asking me to read her mind? I'm just asking you to look at the doctor's notes. Well, the doctor, what is the question? I apologize if you could rephrase. Well, my question is, is that she was terminated because she made a statement in the doctor's office. A threat, yes. And a reasonable person would say that statement was made out of pain and felt hopeless in getting any treatment from any physician that would alleviate the pain because the physicians were setting up hurdles, which, you know, she was unable to overcome. Would that hurdle be releasing her to light-duty work? I mean, as Dr. Gornat, if I was him sitting here, and I'm the only person that heard that, and she is my patient, and I am caring for her, and I continue to care for her after the fact, right? But I felt that she was serious. She scared me. She scared me enough that I felt like I needed to warn somebody. We've seen enough shootings out here, right, in the public. We hear it all the time. It's like when somebody gets a warning like that, if he feels like there is an immediate threat pending or a threat pending, he felt the obligation to do something about it. I mean, who knows? He might have prevented something bad. Most of us do it out of fear of being sued. You know, and that may very well be, but bottom line is he felt that way. I can't put myself in the position of him, but assuming it was my patient, I would have never done that unless I felt an immediate, you know, there was a real risk involved. If I thought it was nonchalant talk, right, but clearly he didn't feel that way. And so, I mean, and this lady, you know, the record speaks about her feeling like she was a victim, and that's why she didn't comply with her medical treatment. And, I mean, if you want to get into prim total, I think we all should agree that one question is, is she even entitled to vocational rehabilitation? I mean, did she even meet that burden? And if she met it, she didn't establish that she was permanently and totally disabled. Those job searches were clearly, did not demonstrate diligence and unsuccessful attempts. No counselor testified that there was no stable labor market for her. There was. Our counselor, Ms. Richter-Hill, said there was. Ms. Gonzalez was silent on the issue. Therefore, there's no evidence to rebut it. Not the fact that, you know, the commission properly weighed this evidence. There was sufficient evidence in the record to support their decision. It was not against the manifest weight of evidence. With regards to the prim total, with regards to 19D, and whether or not she actually complied with treatment, it's the standards of abuse of discretion. And, you know, that standard should not be overturned unless no reasonable person could come to that conclusion. Yeah, it's a pretty high hurdle, isn't it? It is. It is. Is there any other questions? For foregoing reasons, I mean, we talked about it. They weighed the evidence. The evidence was clear, arbitrated, weighted. The commission looked at it. The circuit court judge, I thought, did a fantastic job analyzing this case and making his decision. But for all those reasons, I request this honorable court affirm the decision of the commission in its entirety. Thank you. Any other questions? I'll start with the two questions together from the Chief Justice and Justice Hudson. I think Mr. Javarani, who's a friend of mine and a fellow SIU law graduate, did a fantastic job of answering in part about how we got to here. Justice Holdridge certainly has read Dr. Gornat's records, and his question illuminates the issue in the answer to Justice Hudson's question about why she wasn't eligible for rehire. My client, inside of a doctor's visit, told Dr. Gornat, I'm in so much pain, if I don't get out of pain, I'm going to go into Walmart and hurt someone. That's what she said. That record was sent to the respondent's insurance carrier, who called Walmart, who then had the Madison County Sheriff's Department, without any other provocative... My client just showed up for work. She was taken by the sheriff's into a room. She was terminated and walked out in handcuffs for saying those 12 or 14 words. That's why she's not eligible for rehire. That doesn't mean she's not a firm total outlaw. And I think what we've focused in on today is this injurious practice. And I want to put some facts, not some talk, some facts on what happened in that weight loss. She presented to Dr. Suda, the weight loss doctor, on September 16, 2010. She weighed 294 pounds. Dr. Suda opined she was at risk for gaining weight due to her injury and sedentary lifestyle. Dr. Suda placed the petitioner on a diet. That's what happened first. Dr. Suda again saw the petitioner seven days later, September 23. He noted, quote, she was losing weight. He further reported petitioner was drinking 32 ounces of water per day, exercising, taking her medications as directed, and following the nutritional program he had prescribed. At this point, she had lost 4.6 pounds. On October 15, 2010, petitioner again presented to Dr. Suda, who again noted she was, quote, losing weight. Dr. Suda emphasized that petitioner needed to adhere more closely to the prescription plan he had developed for her. Dr. Suda's notes from October 15, 2010 through January 2011 all show evidence she was losing weight. On February 7, 2011, however, she began to gain weight. He said that she had associated conditions of diabetes, hyperlipidemia, and hypertension. He said that aggravating factors to this weight gain included her anxiety, fatigue, and poor mobility. Remember, this is a ruptured low back disc injury. So you're telling us in so many words that perhaps the reversal and the weight gain were due to factors beyond her control? Yes. Is that part of what you're saying? Yes, and factors associated with this case. This is not a case where a client didn't try. To me, this case is very important to understand what this court views, how it views injurious practice. You know, I'm a petitioner's attorney. I want injurious practice to mean something like the Gallego case in my brief, where somebody's binding up their arm to try and trick a nerve conduction. But that's a clear case. This isn't all that clear. I know that. But this court should not expand what injurious practice means in light of what Work Comp is. It's a no-fault system of liability. There are things petitioners can do, certainly, to retard their recovery, to increase potential responsibility, financially and otherwise, to the respondent. This is not that case. This is not that case. And to say that this case on these facts is that case, Your Honors, respectfully, I believe is an expansion, a dangerous expansion of what injurious practice means in light of what our system is. You cannot believe Ms. Richter-Hill. You cannot say that it's against the manifest way of the evidence all day long. Read her testimony. Read her direct. Read her cross. She called nine employers, and that's why she said my client had a stable labor market. She called nine people. Do you know what she told those nine people? That my client had operated her own successful business since she was 12. Well, of course she had nine people say she was going to hire my client. My client is a specially educated, disabled, dyslexic woman who helped her dad pick up whores. She then delivered pizzas for a little bit until she got fired from that job, and then she got this job. This is an odd lot, and I'd ask you to say the same. Thank you. Thank you, counsel, both for your arguments in this matter. We'll be taking your advisement. This position is about issues.